JUDGE NATHAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CIV 8931



----------------------------------------------------X

DONNA-MARIE GAYNOR on behalf of
her infant son K.J.,

              Plaintiff,

-vs-

THE CITY OF NEW YORK; RAYMOND
KELLY, Commissioner of the New York
City Police Department; AND NYPD
School Safety Agent JACK ELMORE,

              Defendants.

----------------------------------------------------X

**COMPLAINT**

**JURY TRIAL
DEMANDED**

## PRELIMINARY STATEMENT

1. This civil rights action seeks to vindicate the rights of K.J., a fourteen year old seventh

   grader, who was subjected to excessive force and false arrest by those entrusted with the

   protection of New York City's youth: the New York City Police Department (NYPD) School

   Safety Division.

2. In response to K.J. failing to heed the instructions of teachers during lunchtime, NYPD

   School Safety Agent Jack Elmore violently seized K.J., subjected him to excessive force, and

   held him in handcuffs for nearly four hours. This incident is not unique: the NYPD School

   Safety Division has a pattern and practice of unlawfully seizing students for non-criminal

   behavior that amounts to an official unwritten policy. This policy led to violations of K.J.'s

   constitutional rights.

3. The NYPD School Safety Division employs more than 5,000 School Safety Agents (SSAs)

   who have the authority to stop, detain, search, investigate, and arrest students. Since 1998,

when primary responsibility for school safety was transferred from the Department of Education to the NYPD, School Safety Agents, who patrol all public schools in New York City, have become increasingly involved in matters that are the traditional province of teachers and principals.

4.  The detrimental effects of the over-policing of schools have been thoroughly documented. Known as the "school-to-prison pipeline," reliance on heavy-handed disciplinary techniques, like suspension and arrest, decreases students' chances of academic success and increases students' likelihood of future encounters with the criminal justice system. School districts across the country have recognized the problems associated with these practices and have instituted reforms emphasizing better supervision and training of school safety agents. New York City, where the NYPD's School Safety Division arrests hundreds of schoolchildren every year, has failed to address the issue in any meaningful way.

5.  The defendants violated K.J.'s rights under the Fourth and Fourteenth Amendments to the United States Constitution and the laws and Constitution of the State of New York. He seeks compensatory damages for his arrest and subjection to excessive force, attorney's fees, and any other such relief this Court deems appropriate.

**PARTIES**

Plaintiff

6.  Plaintiff K.J. is fourteen years old and appears by and through his mother, DONNA-MARIE GAYNOR. K.J. is enrolled in the seventh grade at J.H.S. 144 in the Bronx.

Defendants

7. Defendant THE CITY OF NEW YORK is a municipal corporation duly incorporated and existing within the State of New York pursuant to state law. The NYPD is an agency of the City of New York.

8. Defendant RAYMOND W. KELLY is the Commissioner of the NYPD, and has policymaking and supervisory authority over all officers and operations of the NYPD, including its School Safety Division. He is sued in his official capacity.

9. Defendant NYPD School Safety Agent JACK ELMORE is or was an employee of the NYPD School Safety Division at all relevant times. He is sued in his official and individual capacities.

### FACTS

### March 5, 2013 Incident at J.H.S. 144

10. On March 5, 2013, K.J. was thirteen years old and enrolled in the sixth grade at J.H.S. 144 in the Bronx, a school operated by the New York City Department of Education.

11. That day, at approximately 10:30 a.m., K.J. and three other students sat on a radiator in the hall outside of the school's cafeteria during their lunch period. K.J. routinely does not eat lunch inside the cafeteria, preferring to spend his lunch period outside of the cafeteria because he does not eat the food served there and does not like the smell of the room.

12. A teacher at the school approached the students and asked them to go inside the cafeteria. K.J. declined. The teacher notified the students that she was going to get another teacher.

13. When the second teacher arrived, she instructed the students to go inside the cafeteria. K.J. again declined to do so. The three other students complied. The teacher left K.J. alone in the hall.

14. A school aide arrived a few minutes later and asked K.J. to enter the lunchroom. K.J. again declined. Another school aide asked for someone to call for an SSA.

15. Defendant School Safety Agent Jack Elmore then arrived at the radiator in the hallway. He asked K.J. to enter the lunchroom. K.J. again declined. He told Elmore that he would not enter the lunchroom because he did not like the smell or the food.

16. Elmore then placed his hand on K.J.'s back and pushed him off the radiator. Elmore repeated his instruction to K.J. to enter the cafeteria.

17. When K.J. refused to enter the cafeteria again, Elmore grabbed K.J. by the hood of his sweatshirt and dragged him down the hall, choking him. K.J. told Elmore that he was choking him, but Elmore made no response except to continue dragging K.J. down the hall. K.J. unzipped his sweatshirt as he was dragged to relieve the pressure on his neck.

18. When Elmore and K.J. arrived at the "SAVE Room," a classroom designated for students who are placed in in-school detention, a teacher unlocked and opened the door. Elmore shoved K.J. into the room.

19. Scared, K.J. reached for either a desk or chair to place between himself and Elmore. K.J. held it in his hands at about waist level.

20. At this point, the school dean entered the SAVE Room.

21. A few seconds after K.J. picked up the piece of furniture, Elmore grabbed it out of K.J.'s hands and tossed it aside.

22. K.J. then picked up another piece of furniture (again, either a desk or chair) and held it at about waist level between himself and Elmore. Elmore took it from his hands and threw it aside.

23. K.J. never raised either piece of furniture above his waist and never threatened—either verbally or by conduct—to strike Elmore or anyone else. K.J. never intended to injure Elmore or anyone else in the SAVE Room.

24. Elmore then charged toward K.J. and picked him up by the hood of his sweatshirt and the waist of his pants. Upon information and belief, Elmore was 6'2" tall and weighed approximately 275 pounds. At the time of the incident, K.J. was 13 years old, 5'9" tall, and weighed only approximately 120 pounds.

25. Elmore lifted K.J.'s entire body at least six feet into the air, above Elmore's head, and dropped him to the floor. K.J. landed on the floor chin first, sustaining a laceration to his chin and a chipped tooth. Elmore handcuffed K.J. while he laid face down on the floor.

26. K.J. bled profusely from his chin, prompting the dean to call the school nurse to attend to K.J.'s injuries. A school official later called for an ambulance.

27. At some point, a school official called K.J.'s mother, alerting her to the incident between K.J. and Elmore.

28. Upon information and belief, Elmore was in no way injured during the encounter with K.J.

29. Emergency medical technicians briefly treated K.J. at the school and, upon determining that he needed stitches, took him via ambulance to Jacobi Medical Center. K.J. remained in handcuffs the entire time he was being transported to the hospital and was accompanied by five SSAs who either rode in the ambulance or in an NYPD police van.

30. At Jacobi Medical Center, K.J. received three stitches to close the wound on his chin. Doctors also noted that his tooth was chipped during the incident. K.J. remained in handcuffs the entire time he was at Jacobi Medical Center.

31. K.J. was then transported to the NYPD's 49th Precinct in the Bronx. K.J. remained in handcuffs during transport to the precinct.

32. K.J.'s mother, who had accompanied K.J. to the hospital in the ambulance, was told to walk to the precinct from Jacobi Medical Center by the SSAs.

33. K.J. was placed in a holding cell at the 49th Precinct and remained handcuffed.

34. Approximately four hours after he was arrested by Elmore, K.J. was released from the 49th Precinct when an NYPD officer informed him that he was free to go. K.J. did not receive a ticket or summons and was not instructed to appear in any court.

35. Although K.J. presented no resistance, aggression, or threat of harm to himself or others, he remained in handcuffs continuously from the time Elmore handcuffed him until he was released from the 49th Precinct. At no point during that period was K.J. free to leave or terminate his encounter with Elmore or any NYPD personnel.

36. On May 30, 2013, K.J.'s mother served a notice of claim on K.J.'s behalf on the Defendant the City of New York pursuant to Section 50-e of the New York General Municipal Law. On October 16, 2013, K.J. and his mother attended a hearing convened by Defendant the City of New York pursuant to Section 50-h of the New York General Municipal Law.

**The NYPD School Safety Division's Custom of Seizing Students in Response to Minor Violations of School Rules Without Suspicion of Criminal Behavior**

37. Members of the NYPD School Safety Division engage in a pattern and practice of seizing New York City schoolchildren without reasonable suspicion of criminal conduct and arresting students without probable cause of criminal wrongdoing. Despite actual knowledge of this pattern and practice, the City of New York and Commissioner Kelly (together, "City Defendants"), have allowed this unconstitutional practice to continue and have failed to pursue corrective action against SSAs who engage in such abuse. As such, the

unconstitutional seizure of New York City school children by members of the School Safety Division amounts to an official, though unwritten, municipal policy. This policy led to the violations of K.J.'s constitutional rights.

38. Upon information and belief, a significant number of New York City public school students under the age of 16 have been seized, detained, and sometimes even arrested for non-criminal behavior, even though the New York Family Court Act prohibits such arrests. Upon information and belief, like K.J., many of these students are released without ever being charged with any crime.

39. City Defendants had actual knowledge of the NYPD School Safety Division's pattern and practice of arresting students for non-criminal violations at the time of K.J.'s arrest. Pursuant to the Student Safety Act, a New York City law, the NYPD is required to report publicly the number of arrests, summonses, and "non-criminal incidents" in schools. Non-criminal violations account for a significant number of school-based arrests and summonses. For example, 59 percent of all summonses issued from July 1, 2012 to June 30, 2013 were for disorderly conduct, a non-criminal violation under New York law.

40. City Defendants also received notice of the School Safety Division's unconstitutional pattern and practice of seizing schoolchildren in response to minor misbehavior without reasonable suspicion or probable cause of criminal conduct through the substantial public discourse that has taken place on this issue. In 2009, the Honorable Judith Kaye, former chief judge of the Court of Appeals of New York, convened a symposium to address the number of students being arrested and suspended in New York City public schools. As a result of the symposium, the New York City School-Justice Partnership Task Force was created. In May 2013, the New York City School-Justice Partnership Task Force issued a report highlighting

the significant number of students who are arrested and detained for minor misbehavior. High-ranking NYPD officials, including the chief of the NYPD School Safety Division, received a copy of the report.

41. Concerns about the criminalization of school discipline were likewise acknowledged at an April 2013 New York City Council Hearing. Bronx Council Member G. Oliver Koppell reported that SSAs were "out of control" and that "principals don't have power to order school safety to do something." Randi Herman, First Vice President of the Council of School Supervisors and Administrators similarly lamented that "principals have absolutely no oversight over school safety agents and the actions they take while on school property." Assistant Chief Brian Conroy, Commanding Officer of the NYPD School Safety Division, appeared at the City Council hearing on behalf of Defendant Commissioner Kelly and heard the testimony of numerous individuals and organizations who addressed the heavy-handed tactics of School Safety Agents.

42. In recent years, the aggressive tactics of the School Safety Division have been heavily documented in numerous stories appearing in high profile news outlets, including the New York Times, CBS News, Gothamist, and the New York Daily News:

   a. In 2012, New York Civil Liberties Union Executive Director Donna Lieberman published an op-ed in the New York Times on the detrimental effects of the presence SSAs in New York City schools. The op-ed discussed several issues, including the prevalence of minor disciplinary problems escalating into criminal activity.

   b. Sixteen-year-old J.M. of Bronx International High School was pinned down by more than 10 school safety agents after trying to return to school after a dentist appointment.

c.  In 2011, 7-year-old J.A., a special education student in Queens, was handcuffed and taken to a hospital after becoming upset and throwing a tantrum, though his actions threatened neither himself nor others.

d.  An 11-year-old student recalled seeing one of his classmates handcuffed and arrested for fighting over a pencil.

e.  An 18-year-old student reported being ticketed for carrying a bottle of water through a scanner.

f.  In 2010, 12-year-old Queens student, A.G., was handcuffed and detained for hours after doodling on a desk in erasable marker.

g.  In May 2010, nine-year-old, 70-pound, J.W. was seized and handcuffed after getting into a minor fight with another student at his Brooklyn school. J.W. was transported to a nearby hospital where he was held in handcuffs for two hours before being released.

h.  In 2008, 5-year-old D.R., who suffers from speech problems, asthma, and attention deficit disorder, was handcuffed and sent to a psychiatric ward for knocking items off his principal's desk. D.R., who weighed 68 pounds and stood 4'3" tall at the time, was held for four hours and evaluated at the hospital before being released to his mother.

i.  In 2007, 13-year-old Brooklyn student C.F. was handcuffed and arrested by police after she wrote "okay" on a desk during school. C.F. was led out of the school in handcuffs and taken to a precinct, where she was held for three hours and charged with criminal mischief and the making of graffiti.

     j.   NYPD data released in 2008 indicate that an 11-year-old student was arrested for trespassing at his own school.

43. In many cases, the seizure of a student for such minor misbehavior is not documented in publicly available data. The vast majority of data collected under the Student Safety Act concerns interactions defined as "non-criminal incidents." Though this would seem to suggest that students are subject to a minimal degree of intervention by law enforcement, actual practices by the NYPD School Safety Division may be more significant. For example, upon information and belief, a "non-criminal incident" may indicate that a student was detained, handcuffed, and transported to a police precinct, then released without being formally arrested, booked, or charged with a crime, as happened to Plaintiff K.J.

44. Despite the abundance of Student Safety Act data, the extensive media coverage of unconstitutional SSA behavior, and frequent litigation against the City regarding misconduct by SSAs, the NYPD School Safety Division continues to maintain this unconstitutional policy.

45. High-ranking NYPD officials—including Defendant Kelly—have stated publicly that the role of the NYPD in schools is to remove "unruly" students from school. Upon information and belief, "unruly" encompasses students who have engaged in non-criminal behavior. Such "removal" unquestionably constitutes a seizure by law enforcement. The fact that at least one municipal policymaker with final decision-making authority has acknowledged and sanctioned the seizure of "unruly" students absent reasonable suspicion or probable cause of criminal wrongdoing further demonstrates that the practice of unconstitutionally seizing New York City school children amounts to official municipal policy.

## JURISDICTION AND VENUE

46. This action is authorized by 42 U.S.C. § 1983. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

47. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's New York state constitutional and state law claims.

48. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2). Plaintiff's claims arise in Bronx County in the state of New York, which is within the Southern District of New York.

## FIRST CAUSE OF ACTION

49. The Defendants' actions violated Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## SECOND CAUSE OF ACTION

50. The Defendants' actions violated Plaintiff's rights under Article I § 12 of the New York State Constitution.

## THIRD CAUSE OF ACTION

51. The Defendants' actions violated Plaintiff's rights under the common law of the State of New York to be free from false arrest, assault, and battery.

## FOURTH CAUSE OF ACTION

52. The Defendants' actions violated Plaintiff's rights under Section 305.2 of the Family Court Act of the State of New York.

## PRAYER FOR RELIEF

53. WHEREFORE, Plaintiff humbly requests that this Court:

    1) Assume jurisdiction over this matter;

2) Declare that the defendants' actions amount to violations of Plaintiff's rights under the Fourth and Fourteenth Amendments to the United States Constitution, the Constitution of the State of New York, and the laws of the State of New York;

3) Award compensatory damages for injuries sustained by K.J.;

4) Award Plaintiff's attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

5) Grant any other relief deemed appropriate by the Court.

Respectfully submitted,

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION

ALEXIS KARTERON
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
(212) 607-3300
akarteron@nyclu.org

Counsel for the Plaintiff

Dated: December 17, 2013
       New York, N.Y.

On the Complaint:
RYAN BARRETT*
DAVID GIROUX*
ISHA MEHMOOD*
Law Students
New York University School of Law
Civil Rights Clinic

* The Plaintiff and the New York Civil Liberties Union Foundation will be seeking leave of court to permit these students to serve as attorneys in this matter pursuant to the Southern District of New York's Plan for Student Practice in Civil Actions.